and others, 21-33-26 is the appeal number. We're going to begin with Mr. Bont. Good morning. Good morning, Your Honors. May it please the Court, my name is John Bont. I, along with co-counsel, Ms. Garce, represent the defendant, Carrie Agee, and I will be arguing the defendant's on appeal. The government's theory of property fraud in this case is legally invalid. The government recently conceded as much to the United States Supreme Court in a different case, and it requires the reversal of all counts under this Court's decision in United States v. Barrera. In this case, the government's theory of property fraud was that the defendant's defrauded the SBA out of its right to control its risk of loss by procuring loan guarantees that the SBA would not have issued but for various agency rule violations and misrepresentations. What are you relying on, Mr. Bont, to argue that that was the government's theory of the case? I've looked through the arguments. I've looked at the jury instructions. I don't see anything where the government was arguing to the jury, or in the indictment even, that this right to control theory, which I realize that theory may be under a cloud at the moment, but I don't see anything that supports your argument that that was the government's theory of the case. It seems like you are trying to argue that now because it's part of the Simonelli case before the Supreme Court. The government argued, particularly in closing, cited on page 8 of our reply brief, it's page 1586 of the transcript, that a loan guarantee is property because it's the right of the SBA to guard against its risk of loss. So that was the- But a loan guarantee, the SBA's guarantee, that's a separate question than the right to control the process. Well, a loan guarantee is only a right to control, Your Honor. It's a right to control- No, it's not. It's a loan guarantee, and the case law says this, is a guarantee you're going to pay money. It's a promise to pay in the event that some happens, and the way that the government presented it in this case is that it never would have issued the loan guarantee but for misrepresentations and agency rule violations. So are you arguing that any time there's a loan guarantee, it's a right to control case? I think Simonelli's going to answer that question, quite frankly, Your Honor, because Simonelli is also a contract case where it's dealing with a contractual obligation to pay. I'm not so sure Simonelli's going to take on the loan guarantee and the right to pay money, especially given some of the comments during oral argument. It's possible that they don't, but again, factually, it's dealing with a contractual obligation to pay, which is what a loan guarantee is. I'm sorry to interrupt, but let me come back, Mr. Bont, to your argument. Is that the only piece you are relying on for your argument, that the government relied on a right to control theory here, the statement you just gave on page 8 of your reply from the closing argument? No, Your Honor. The entire case was based on the agency's right to control, its interpretations of its rules. You agree the jury was not instructed on any right to control theory? That's correct, Your Honor. Unlike Simonelli, where the jury was clearly instructed on that. But in Simonelli, they're not arguing that the jury instruction was invalid. It's also before the court on a Rule 29 motion. But it's the theory of the case. I understand it's not a jury instruction case there, but it supports their theory of the case, because that's what they argued to the jury, and that's what they had the instruction on. Correct. It was a theory of the case instruction. However, regardless of whether or not a theory of the case instruction was given, which it was not in this case, the government shouldn't be permitted to bring an invalid legal theory in front of the jury in any respect, whether it's argument, presentation of evidence, or otherwise, which is what happened in this case. So, Mr. Bonk, in keeping with the same question, I think it's the same question, it's just going to be in different words. Okay. And that is this. I think your argument is fair that the government did focus on the SBA being defrauded as to who it would issue guarantees to, because that's all the evidence that was put in about being less than candid, making misrepresentations about the purpose of the underlying loan proceeds. I think that's totally fair, okay? But that seems incomplete to me, that there were other aspects of the government's evidence, and that is what you're focused on, and I totally understand why, because of the right to control and the possible legal vulnerability around that, okay? You're very much focused on that kind of front end, if you will, right? And you're saying what the government basically was arguing and what it proved is that the SBA wasn't getting candid information, and because they weren't getting candid information, they were making tainted choices on who to give, and you'd say, well, that sounds like a lot of the right to control. That sounds like Cleveland, right? That's why you're arguing that. Okay. My point is that there's a back end of the case as well, and the back end of the case is that there was also fraud in getting the SBA to honor the guarantees. In other words, there's, I don't know what the dollar amount is, you will, but ballpark-ish $10 million of actual payouts here, okay? And to get the you had to apply or you had to request that the SBA make the payout, and that in that paperwork and in those transmissions, the misrepresentations were renewed that way. So if there's a back end of the case, doesn't that distinguish this from just the front end cases, if you will? My words, not yours, okay? On right to control liability. If that were the only theory that the government would have pursued in this case, I wouldn't be- Meaning the back end? The back end where there was actual money being- Okay, but going to the point Judge St. Eve has made, if the jury's properly instructed, and nobody has an issue with the jury instructions around the fraud, the 1343 or 1349 instructions that way, aren't we just looking at the totality of the evidence against the standard of review that you face and asking, could a rational jury, considering the front and back end evidence, reach verdicts that are legally sound with this court fully mindful of what's in front of the Supreme Court in Seminole? No, because of this court's decision in United States versus Barrero. Similarly- Barrero, though, is different. Barrero, by its terms, involved flawed jury instructions. The jury there, you'll remember, I mean you're mentioning it, you'll know this. The jury there was given kind of two different instructions. And what the court said is that's problematic because we don't know on what basis they returned that verdict. And that's the same situation we have here. The instructions were brought up- The premise is different. Well, but just because we didn't argue jury instructions on appeal doesn't mean that the Rule 29 motion goes out the window. That's how Barrero was raised, that's how Seminole was raised. The problem is that when the instructions are broad enough that we cannot determine on appeal whether or not the jury convicted on a legally invalid theory or a legally valid theory, Barrero says the correct outcome is reversal. And that's what happened here. Now in Barrero- The jury was instructed on a scheme to obtain money or property through the guarantee. I don't know how that is broad enough that they could convict solely on this right to control theory. Yeah, on front end only. The evidence of the back end fraud is there in the case. And there was evidence in Barrero as well of taxpayer fraud, that the taxpayers were frauded because sales taxes weren't properly remitted, because improper prices were put on the licenses at issue. And this court said that that's a problem. The government could have pursued that theory below exclusively. And there's no question that the government could have pursued exclusively the payout of money on the guarantees as an actual money interest for purposes of wire fraud. We would still have issues with it, don't get me wrong. But that's not what they did here. I want to make sure I understand your argument. Are you arguing that any time someone submits fraudulent documents to obtain a loan, if there's no payout on it, that that's a right to control theory that would potentially fail if the Supreme Court finds that that right to control is not a valid property interest? Correct, Your Honor. If the government's sole focus is on that guarantee, that promise to pay in the event of future circumstances, that is synonymous with the right to control. That's why the prosecutor argued it as such in this case. But when you say the government's only focus, there's a lot of evidence that there were guarantees that were paid out against the backdrop of renewed false representations. Four of the nine loans at issue in the case did not default, so there was no payout. For five of them, there was some payout. The ballpark $10 million comes from the five, right? I don't recall what the precise number is, but it comes from the five, you're right. However, with those loans in particular, as we raised in our sentencing arguments, there was no proximate causation nexus between the misrepresentation and the defaults at issue. One follow-up question before we switch to topics, if you're going to. Under your argument, would the Supreme Court have to overrule its opinion and pass guanito in order for your argument to be sound, where they found that the right to be paid money has long been thought to be a species of property? That makes sense, given the economic equivalence of money and money legally due? Well, I believe that case deals with the right to pay money, which is different than just a conditional obligation. But there they found that the right, again, the right to be paid money, which is a guarantee, as opposed to the actual payout, was the property interest, which would be one of the pieces that has been argued here, that the guarantee, the right to be paid, is what the property interest is. I would expect that the Simonelli opinion would considerably narrow that decision that Your Honor references. That they'd have to actually pay out money. Correct. I think even this Court's prior decisions, when it talks about the right to control risk of loss, mentions that actual or intended financial loss is a requisite proof in those particular cases, which the jury, of course, was not instructed that it had to find in this case. And as a result, we have other arguments regarding the reasonable foreseeability of the loss and whether it was caused in fact or in law by the misrepresentations. But shifting gears, if I might, to an issue that you raised, Judge Scudder, the government, although it charged a conspiracy to commit wire fraud affecting a financial institution, the object of the conspiracy that the government proved at trial was really different. It was the object of the conspiracy, as found by the district court judge below, was to defraud the SBA, which is different than a conspiracy to commit wire fraud affecting a financial institution. It's a different object. In this case, there was no evidence, and the government didn't argue, that the defendants intended to affect a financial institution or that financial institutions were in fact affected. Is it your argument that in order to prove that the fraud affected the financial institution, that you have to show that the defendants intended to defraud the financial institution? Only on the conspiracy count, Your Honor, because the object of a conspiracy is part of the conspiracy charge. It's something that the government has to prove. But the object they charged here is the SBA. The object of the conspiracy was the SBA, as charged and as argued. The effect of the financial institution just brought in the other federal statute. I would agree with Your Honor that as argued, the object of the conspiracy in this case was to affect the SBA, but as charged, it was a conspiracy to commit wire fraud affecting a financial institution, and the government even argued, we filed motions to dismiss early on in the case, and in response to those motions, the government even argued that it's a separate conspiracy. The object of the conspiracy is different than the other conspiracy that the government initially charged in this case. Is any court endorsed what you're saying? What would you point us to where a court has held that for 1343, 1349 purposes, where there's an effect on the financial institution, that the charging instrument and the proof has to focus the object of the fraud on the financial institution as opposed to just the effect? What court has held that? Specifically, Your Honors, Cody Aikas versus the United States was the Supreme Court decision that said you can't prove two conspiracies when you've only charged one. That's a separate argument. Well, Your Honors, the object of conspiracy is an element that needs to be proved at trial, and in this case, the government didn't prove that. Why isn't the legal analysis no more complicated than that? We'll give you time. Don't worry about it. The object of the conspiracy was to defraud the Small Business Association. That's what it was. Okay. Now, it just so happened that there was an effect upon financial institutions, so we're going to charge it accordingly. Why is that legally problematic if the case is approached that way? Because the object has to include everything that the government stated that the object was in the indictment, which wasn't just to defraud the SBA. It was to commit wire fraud affecting a financial institution, and affecting a financial institution has been defined by this in other courts as subjecting the financial institution to an increased risk of loss, and the government just did not prove that that was part of the object, that wasn't its focus at the case. It was an incidental byproduct, and that much was presented by the government at case, but not that it was the object. Finally, Your Honors, with regards to defendant's sentencing argument, and I mentioned this earlier, remand for resentencing would be required in this case in any event, because the district court judge employed an improper loss methodology that focused on but-for causation, and not legal causation or proximate causation as a common law causate. The government argued, and the district court based its loss analysis on the premise that the SBA never would have guaranteed the loans at issue had it known of the defendant's misrepresentations and rule violations, but as this court held in United States v. Luce, that is but-for causation, it's not proximate causation. Mr. Bond, you mentioned that, I think it was four of the nine loans did not default, am I right? That's correct, Your Honor, four of the nine loans did not default. What is your position with respect to the amount of restitution due on those loans?  That did not default. On the loans that did not default, there should not be restitution, Your Honor, because there was no loss. There was no actual loss. And the position of the district court was? Similarly, that there was no restitution ordered on the loans. So the only restitution was on the loans that did default? That's correct, Your Honor. Okay, thanks. In particular, one of the loans involved a $50,000 misrepresentation about whether or not an equity injection was going to be made by the owner. And the $50,000 misrepresentation did not proximately cause the loan to default several years later. Mr. Bond, in looking at the sentencing transcripts, although the court may not have used the word proximate cause, proximate cause is if the defendant knew or reasonably should have known and it was reasonably foreseeable. And if I look at the transcripts of everybody who was sentenced, the court specifically found with respect to, I think, everybody, that they knew the risk of the fraudulent activities and they were aware of the likelihood that they would default. Why isn't that sufficient? Your Honor, I see my time is up. Can I briefly answer Your Honor's question? Thank you. There are different sentencing transcripts in this case, Your Honor. I'm intimately familiar with one where the district court judge did not make specific factual findings regarding the misrepresentation at issue, proximately causing or somehow increasing the risk of default. But do you agree that even if the court didn't use the word proximate cause, if the court made a specific finding that a defendant knew the risk of their fraudulent activities and were aware of the likelihood that the SBA borrowers might default, that that is sufficient for proximate cause? There has to be a tie between the misrepresentation, the quote-unquote fraud, and the actual loss. So if the district court's analysis were to tie that in, in terms of reasonable foreseeability, then yes. But the district court judge didn't do that here. Thank you, Your Honor. I see that my time is up. I'll pass it on to Ms. Masters. Thank you. Good morning, Your Honor. Ruth Masters, and I represent Defendant Chad Griffin, and today I'm going to address his arguments in this individual brief regarding the application of the sophisticated means enhancement and rest on the briefs for all the other issues. Although I do want to call to the court's attention that the government has conceded there is an error in his conditions of supervised release so that remand is required at least. With respect to the mental health? Yes. Okay. The court here committed procedural error in applying the sophisticated means enhancement to Mr. Griffin in two different ways. It erred in its interpretation of the sentencing guidelines and by relying upon clearly erroneous facts. The sophisticated means enhancement has two limitations. It's limited to the defendant's conduct only as opposed to conduct in the scheme as a whole, and the conduct has to be sophisticated, meaning that it has to be intentionally engaged in by the defendant to conceal the fraud instead of conduct that is the fraud itself. Legal error occurred here when the court unequivocally stated that it was, quote, not just looking at the Touchstone loan or any particular loan, but the overall scheme to evaluate sophistication. Now my client was only involved in two loans, Touchstone and Larson, so looking at the overall scheme was entirely erroneous under the current sentencing guidelines. And even if that alone does not warrant remand to resentencing, the court also relied upon clearly erroneous facts when it attributed conduct in the Larson loan to Mr. Griffin in terms of preparing new documents at the redemption phase of the guarantee when, in fact, the record is clear that he played no role in that. So this court should reject the government's suggestion that it can affirm because in the sentencing transcript the judge references Touchstone and Larson and in the government's opinion the district court could have relied upon those two loans just to impose the enhancement. The fact is the court didn't rely upon Touchstone and Larson, and it stated that was not what it was doing, so there is clear error and remand is necessary. I want to briefly address— Ms. Masters, can I just clarify one thing, please? The court has to make a determination that sophisticated means were used in the scheme and then look at the defendant-specific conduct. I completely agree with that. I want to make sure I understand your argument. The court did state it was looking at the overall scheme to evaluate sophistication. Why wouldn't that just be a comment on finding the first piece of the sophisticated means analysis, namely that sophisticated means were used for the scheme and then the court went on to look at your client-specific role? Because, Your Honor, the court's—because it's not— I guess we would disagree with Your Honor's statement. The sophistication analysis does not require looking at the overall scheme, and in fact the Wayland case, which the court cited to, has been replaced by the current version of the guidelines, which says you only look at the defendant's conduct to evaluate sophistication, and you don't look at the overall scheme. That's the plain language of the comments in the sentencing guideline. So I would respectfully think that the premise here is that the court couldn't— shouldn't at all have been looking at the overall scheme. I certainly agree that if simply the scheme involves sophisticated means, that alone is not sufficient, and I agree the case the court cited, the guidelines have been updated since then. But it seems the court—that initial statement was just saying there is sophisticated means here, but then it went on to look at Mr. Griffin's conduct in particular. Well, let me make two responses to that. One is I think we can't know that, right? As a review in court, I don't think the court can know that when the court specifically states that's not what it's doing. It's looking at all the scheme as a whole. So how do we know that it really only applied the enhancement because of Mr. Griffin's conduct? But the other point I'd make is the court's wrong on the conduct she's attributing on the facts to Mr. Griffin. The court comments that he is responsible for conduct in Larson, and he unequivocally is not. He didn't prepare false documents that the court is attributing to him. In the Touchton loan, the court refers to the use of a bridge loan structure, but in fact the bridge loan structure is actually disclosed to the SBA at the time of redemption. So the documents, even if there was some concealment regarding the bridge loan in the initial application, at the time of redemption with the purchase demand kit is given over to the SBA, it shows that money went to pay the BBB bridge loan off, and that was not an authorized use. And there is even a specific page that references that it went to taxes and penalties, and those sites are in our brief, but I think it's Government Exhibit 126 at 217-218, and there's other pages cited as to that. Thank you, Your Honor. Thank you. Okay, we'll hear from the government. Thank you. Good morning, Your Honors, and may it please the Court. Andrew Lang for the United States. The defendants were charged and convicted of a single conspiracy to defraud the SBA that affected financial institutions. They conspired to deceive the SBA regarding the eligibility of certain loans and borrowers for valuable SBA guarantees, promises to pay money in the event of default. And as a result, they were able to obtain those guarantees, and in some cases payments on those guarantees, that they could not otherwise have obtained. So we ask this Court to affirm in all respects except Griffin's amended judgment. You know, Mr. Lang, when you first open the briefs in this case, the first thing that hits you is, is this the way they usually charge this conduct? It's a fair question. I think the answer is yes, because when it comes to a government loan guarantee, and we've seen this in some of the other cases that we cite in our brief, like Medeo out of the D.C. Circuit, it makes sense to charge that as wire fraud, because the government is being deprived of a property interest in the guarantee. And then, of course, also, as Judge Scudder put it on the back end, is being deprived of money as well. And so the right to control gloss or lens on this case, I don't think adds anything to the analysis, because this is a traditional theory of money or property fraud. The defendants deceived the SBA in order to obtain its property in the form of guarantees, as well as it usually charged the effect on the financial institution aspect of the charge here, and they just usually charge the fraud on the SBA and leave it at that. I think that the charge could have been brought either way. I don't know statistically how often it's brought either way. You know, you'd expect that the arguments we're seeing before us today by the defendants would have been challenged by a lot of other lawyers over the years, and they'd be a lot more fed second, third, and fourth than there is. It just gives this whole case a kind of suspicious whiff, you know, when you look at it. What's the government up to here? Well, again, I think this is a prototypical theory of wire fraud. I agree that affecting a financial institution doesn't arise as often in the cases as pure vanilla wire fraud, but with respect to the defendants' arguments about whether the defendants had to intend to defraud a financial institution separate and apart from intending to defraud the SBA, this court's case law, in particular Marr, which we cite in our brief, forecloses that argument. This court has explained that Congress, in protecting financial institutions from wire fraud, intended to extend the statute of limitations where a scheme to defraud affects financial institutions. What does the defendant have to know about the financial institution? Does it have to have the intent to defraud that financial institution? No, and this court has said as much in Marr in discussing the jury instructions in that case. This court explained that the district court was correct to instruct the jury, you have to find intent to defraud, but you do not have to find intent to defraud a financial institution. Do you have to show anything with respect to what the defendant knew about the financial institution? Not according to Marr. The financial institution has to be affected in the sense that it has to be exposed to some new or increased risk, and the jury instructions in this case were consistent with the jury instructions that this court signed off on in Marr. You have to have a scheme to defraud, of course, intent to defraud, use of the wires, and that scheme in a case involving affecting financial institutions has to affect a financial institution by exposing it to new or increased risk. Tell me about the government's evidence that there was an effect on a financial institution here. Sure. So the most straightforward evidence of that came from SBA witnesses, notably Teresa Hendricks toward the beginning of the trial, who testified about the purpose of the SBA guarantees. The whole point of the SBA guarantees, according to Hendricks, is to lessen the risk for banks, to encourage them to participate in lending for the small businesses that the Small Business Administration is set up to serve. Kelly Ayers, a cooperating witness who worked at one of the banks, testified that the reason that banks go out of their way to try to get these loan guarantees is because they greatly reduce the bank's risk when it comes to making these loans to borrowers that might otherwise have trouble getting credit. And it's fair to say that the banks are, in the normal course of events, active players in getting the SBA. Absolutely. And in this case, there was ample evidence, including from that cooperating witness, as well as ample documentary evidence that the bankers were involved with BankServe in applying for these guarantees and, in some cases, making misrepresentations in order to get the guarantees. What's the government's position with respect to the actual impact on the banks in this case? What's the government's position on what has to be shown, if anything? So the government's position is that the most straightforward way to look at it is the government had to prove that the banks were exposed to a new or increased risk of loss. And in this case, there was testimony, including from the witnesses that I mentioned, that the deception of the SBA made it more likely that in the event of a default, which did actually come to pass in several of these loans, the SBA would discover the fraud and refuse to pay out, leaving the bank holding the bag. So that was the risk to the financial institutions. What was the risk? That's how you encompass the, what is it, four loans that did not default? Four did not default, correct. Yes, but the risk existed in all of those cases, whether or not it materialized into an actual loss. And this court has held that you don't have to show that the bank actually lost money. I believe that's from Serpico. You have to show that the bank experienced a new or increased risk, but not an actual loss necessarily. So in a situation like this, where the front-end fraud was exposed and then the misrepresentations were renewed in request for asking for, was there any evidence before the jury that then guarantees that were actually paid on were then subsequently voided and the SBA turned to the banks to recoup? I believe there was testimony as a general matter that that's what would happen if the SBA discovered fraud. And I know with respect to one of the loans, the SBA initially tried to send out an $81,000. That's why you answered Judge Ripple the way you did. If that would happen, you'd say a financial institution is exposed to some risk. It's financial risk. Yes. Yes, exactly. I also want to touch on the right-to-control theory generally. I agree with the premise of Your Honor's question, Judge St. Eve, that I think the guarantees themselves should be seen as property under Pasquantino. They are a promise to pay money in the event of default. Do you agree with Mr. Font that that is at risk with Simonelli? I don't think. I hate to prognosticate. I understand. I doubt that Simonelli will overrule Pasquantino or the premise of that decision that a promise to pay or the right to be paid money is a property right. I would be surprised if that happened. But, of course, Simonelli might say a lot of new things about fraud generally. And I would say we don't oppose the prospect of this court potentially holding this case in abeyance until Simonelli is decided because that is possible. But I doubt it. So I thought that the clearest distinction, if there's legal infirmity with the right to control, we'll all stand by and await word from the Supreme Court on that. But if there's legal infirmity, it's got to be with respect to what I'm calling this kind of front-end fraud here, right, on the SBA's right to make decisions untainted by fraud as to how it issues guarantees. Now, to be sure, the point that Judge St. Eve is emphasizing is correct. This is not a gaming license like we saw, right, or making decisions regarding traffic on a bridge or anything like that. A guarantee has a different characteristic, much more of a characteristic of a financial obligation that way. But the case is not – I don't read the evidence as just being front-end evidence. I thought that the way that this was both charged and then proved was that the fraud ended up having consequences here. I don't know if I got the dollar amount right, but in the neighborhood of $10 million of guarantees that were paid out in situations that should not have been paid because the underlying – the proceeds were being borrowed for impermissible purposes that didn't align with the SBA's guarantee protocols. Am I wrong about that? I don't think so, Your Honor. I completely agree with a couple of things in Your Honor's question. So, first of all, I think Your Honor is correct that if there is a so-called right-to-control issue with this case, which we don't think that there is, I agree that it wouldn't be with the money that the SBA actually paid, the back end of the fraud. And at most – And isn't that part of the conspiracy that's embodied in the offense of conviction? Yes, and the indictment, I think, makes that clear. The indictment alleges that part of the conspiracy was, in the event of default, to send these demand letters to the SBA, make sure that it didn't discover that the guarantees had been fraudulently obtained, and make sure that it would pay out. So, yes, I agree with Your Honor that money was, from the beginning, part of the way that the government charged and proved the conspiracy. That was part of the object. The point I also want to make is that the guarantees themselves are still a property interest, and the right-to-control theory doesn't change that because they are straightforwardly a promise to pay money under certain circumstances. That distinction is that, at least in the case laws as we have before us here, that the financial guarantee of the SBA is not the same as the Louisiana gaming license in Cleveland. They are altogether different. Yes, exactly. And Medeo from the D.C. Circuit, which we cite in our brief, makes that point and distinguishes a number of older cases having to do with regulatory interests. Obviously, that's an older case. I think it predates Cleveland and, of course, Kelly. But the D.C. Circuit distinguished a loan guarantee from, I think the examples were, the FAA issuing a pilot license or a state issuing a video gaming license or something along those lines. Those regulatory interests are not the same as a promise to pay money. Those are more ephemeral and tangible. These are the government's property rights. And it would be the same case if the loan guarantees were being issued by a private entity or a nonprofit. It would still be a property interest. In the interest of time, can I switch you to a different topic? Please. I have some concerns about the conviction of Matt Smith. Sure. And I want to focus in particular, sorry for the specificity, but one of the key pieces of evidence is the e-mail that's in Government Exhibit 125. You know what I'm talking about? If you're honest, I'm sorry. This relates to the Touchton Industries matter. That seems to be, if there's proof that Mr. Smith was a member of or joined a conspiracy here, that seems to me to be the strongest evidence. And I have some concerns about whether that evidence is enough. Sure. What's your response to that? So our response to that is that the government presented sufficient evidence to prove that Matt Smith joined the conspiracy. We agree with the district court in ruling on the Rule 29 motion that this was a closer question than it was for the other defendants. But there was enough there to show his knowledge of the conspiracy. What's the enough, though? So a few things. So first of all, there was evidence of his knowledge of the conspiracy's objectives and of the methodologies that the conspiracy employed. And there was also some evidence, again, less than with other defendants. Can you be as specific as you can? That's going to really help. Sure. I understand, Your Honor. So a couple of things. So first of all, with respect to Larson Cement Stone, Griffin sent an e-mail to others, including Matt Smith, that payroll tax payments would be disguised as working capital. With respect to the Rogers Finishing Tools loan, this is a round page. Hold on. Yeah. Okay. Keep going. I mean, that's the situation where a signature is forged. Right. There was much debate about that on cross-examination. We're not relying on the signature necessarily, but that the participation in the e-mail chain bolsters the circumstantial evidence that he was aware of everything that was going on, and he was part of the cast of characters who were engaged in this longer-running conspiracy. With respect to Rogers Finishing Tools, and this is a round page 993 of the transcript, although Agee was doing most of the talking on the call with Mr. Crawford, he said that he relied on Matt Smith and Agee together to understand the SBA's rules, to follow those rules, to apply for the loan despite the fact that he didn't say anything during that call, did he? So the testimony, I think, was that Agee did most of the talking, and that the idea to use the SBA loan proceeds to cover the $50,000 equity objection came from Matt and Carrie. During that call? I think that was the testimony. I don't have that page. Yeah, I got the testimony right in front of me. It says, who suggested that this was with the $50,000 answer on the phone conversation with Matt and Carrie? This is Crawford's testimony. With Matt and Carrie, Carrie was talking on it. Okay, so yeah, who did the majority of the talking on this phone call answer? Both talked. Carrie was the majority of the conversation, though. Yes. Yeah, so I think they were both on the phone discussing the concept with him. Again, the evidence clearly is that Agee was doing most of the talking, but I think that bolsters the inference that Matt Smith was involved in the conspiracy. There was also other testimony, which we summarize in our brief at page 50, that Matt Smith was one of the members of the cast of characters who were involved with interacting with staff at the SBA, who were involved in moving some of these loans forward. I thought the SBA people didn't have a clue who he was. Not all of them. I believe at least one of them testified that they interacted with him. It just being a member of the cast of characters doesn't get you there. I agree. It's like a mere presence argument. Yes. I certainly agree with Your Honor in that we're not relying exclusively on membership in a cast of characters, but although, again, the evidence is less overwhelming with respect to Mr. Smith than some of the other defendants like Agee or Isley, we think that it is enough for a jury to reach the conclusion that he knowingly participated in the overarching conspiracy. He knew what the conspiracy was up to. He knew what kinds of false representations were being made to the SBA. Do you base that upon his prior marriage? No. We're not relying on the marriage by itself, but there are, again, the communications that we summarize in our brief where he's receiving several e-mails, he's involved in the conversation with Mr. Crawford. So, again, it's... Is there any evidence that he's actively doing anything? I understand your argument that he's on these e-mail chains which might support knowledge of what's going on, but what's your best evidence that he is taking an active involvement in the conspiracy? So I think with respect to the Touchton Industries loan, his proposal of the bridge loan structure helps bolster the evidence of his active involvement. So there I think there is evidence that he... See, I worry about... I'm glad we're having this dialogue. I worry about that because in that same e-mail, okay, he writes, this e-mail has been copied to Kerry and Guy Smith of banks or partners also for their concurrence on the structure, right? And then somebody from... What is this? I don't remember the name of the company here. Ridgestone of the bank. Ridgestone weighs in. And the guy from Ridgestone, Bruce, somebody, is saying, does this follow the terms of the SBA's authorization? It just doesn't look like Mr. Smith is saying, hey, I know that that line item for the $157,000 to the Internal Revenue Service, that's to improperly cover payroll taxes. But we've got to keep quiet about that because if we tell the SBA that, we're not going to get the guarantee. That's prohibited. There's nothing like that here. Yeah, again, I think the evidence speaks for itself. I think the evidence supports at least the inference allowing a rational jury to make the conclusion that Mr. Smith participated knowingly in the conspiracy. Yeah, what I worry about a little bit is that he got precisely wrapped up in the cast of characters. But being a member of a cast of characters does not mean his guilt was proven beyond a reasonable doubt. I understand Your Honor's concern. And again, I don't think that our position has been or is now that his membership in the so-called cast of characters is enough by itself. I think his involvement in these communications over time supports the inference of his participation in the conspiracy. It's the involvement part that gives me pause. I understand he has cc'd on some of these communications and he was on the call, which may be sufficient to establish he had some knowledge of what was going on. But it's the next part of his active participation in it that is pretty weak. I understand that, Your Honor. And again, I would submit on a brief on that. I think we put forth the evidence that there is in the record. I want to switch topics to something that I know it's not as significant as some of these other points, but the defendants have argued that the guarantee fees should not have been included in the actual loss. And you didn't really address that head-on in your brief. Do you agree, and they've admitted it's harmless because it wouldn't impact the actual loss amount or the guideline calculation. First question, do you agree that the guarantee fees are more like finance charges and should not have been included in the actual loss? So I don't agree that they should not have been included in the loss because of the operation of the government benefits rule. And I want to make sure that I take a moment to clarify something that the defendant said in their reply. Separate and apart from the government benefit rule. Do you agree that finance charges aren't included in actual loss for guideline calculation? That's a separate issue having nothing to do with the government benefit. Yes, I agree with Your Honor there. So absent the government benefit rule, I think the defendants would be correct. Okay. So do you think that they were incorrectly included then in the actual loss? No, because of the government benefits rule. And that's where I want to clarify the argument that the defendants are making in their reply brief about Leahy and the amendment to the guidelines, if I might just have a few seconds. Okay, go ahead. The application note defining the government benefit rule, when it comes to unintended recipients of government benefits, has been consistent in substance since the version of the guidelines that Leahy was interpreting up until today. That guideline tells courts if somebody is receiving a government benefit that has been diverted from intended recipients, and now I think it says diverted to unintended recipients, the whole amount of the benefit is loss, not net any fees. So Leahy interpreted that previous version of the government benefit rule, which is substantively unchanged. The amendment that the defendants cite in their reply brief clarified and took sides on a circuit split regarding the effect of the government benefits rule when it came to intended recipients of benefits. So when it comes to intended recipients, if they fraudulently obtain benefits or fraudulently obtain excessive benefits, then the net excessive benefits are the loss. But that's not the effect of the government benefits rule in this case, and that hasn't changed. Unless the court has any additional questions, we ask the court to affirm except with respect to Griffin's judgment. Thank you. Okay, Mr. Lange, thank you. Mr. Bont, why don't we give you three minutes? Thank you. It's a big appeal. There's a lot of parties. Thank you, Your Honor. I appreciate it. I want to first start off by responding to a question that you asked earlier, Judge Scudder, about whether or not there's any case reversing a conviction based on a constructive amendment theory. There is one in the Seventh Circuit that I'm aware of. It's United States v. PG. It's found at 197 F. 3rd 879, and it's a 1999 Seventh Circuit case. It's cited in the Nantour decision, which we mentioned in our brief. Basically, the thrust of those decisions is that the government can limit its theory through its indictment, which our contention is that's what they did here by alleging that the object of the conspiracy was to commit wire fraud affecting a financial institution. Judge Ripple, you asked if this is the way that the government usually charges the case. I would say no, and I think it's important because there is a separate statute here, 15 United States Code, Section 645, which criminalizes making false statements to the SBA, and the existence of a separate statute is something that the Supreme Court mentioned twice in the Cleveland decision as being a persuasive reason why we shouldn't extend a property interest to regulatory fraud, and our contention is that's what the government proved in this case. It proved that there was regulatory fraud, not property fraud. Again, responding to a question that was asked to counsel for the government, there's no evidence in this case that the SBA went back to any of the lenders to recoup payouts that it had made, and I think that's the problem with the back-end fraud theory, as Your Honor has referred to it, Judge Scudder. Because the money was paid out and the financial institutions were made whole, there was no increased risk of loss to the financial institutions. So that element in particular is at issue with respect to the payouts because the money was actually paid out. Yeah, possibly. I mean, part of it may be just outside the confines of the criminal case, right? I mean, it's not clear to me that the criminal case would have to include evidence about the SBA, you know, trying to recoup something from ABC Bank. Well, I think if the government is going to prove that there was an effect on a financial institution, it cannot rely on evidence that the financial institutions benefited. In fact, their risk of loss was reduced. Well, no, I mean, their argument, which you're challenging, I mean, you're being very clear about that, is that that risk, quote, unquote, is not sufficient. The risk of financial loss, I think, is nonexistent when it comes to money that was paid out to the financial institutions. That's correct, Your Honor. Finally, in closing, I will just say that this case bears a lot of similarities to the Cleveland decision, and I realize that that decision dealt specifically with licenses. But in this case, the SBA guarantee in function was similar to a license, and the specific issue, taxpayer problems with the borrower or the licensee having tax problems, was present in the district court during this trial. In fact, it was present in two of the loans at issue in the case, which is on all fours with the Cleveland decision. So under Cleveland and Barrero, I think the proper recourse is to reverse the convictions. If there are no further questions, thank you, Your Honor. Okay, very well. Mr. Bont, thanks to you, and thanks to your colleagues representing the defendants. I understand a couple of defendants had appointed counsel, so thanks to you for your service to your clients and to the court. And Mr. Lange, thanks to you, of course, too. The court's going to take a five-minute recess.